**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID H. KATZ AND BARBARA D. KATZ, | : | CIVIL ACTION NO. **3:CV-03-2377** |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Magistrate Judge Blewitt |
| | : | |
| TOWNSHIP OF WESTFALL | : | |
| | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM AND ORDER**

**I. Background**

On December 24, 2003, Plaintiffs, David H. Katz and Barbara D. Katz, his wife, filed a civil action for breach of contract in the United States District Court for the Middle District of Pennsylvania. This was the Plaintiffs' fourth action which was filed in the Middle District Court of Pennsylvania.[1] All of the controversies center around Plaintiffs' purchase of approximately 740 acres of property located in Westfall Township, Pennsylvania, in May of 1986, and their subsequent attempts to subdivide, develop, and sell the property. Phase I was the commercial development of the Plaintiffs, and Phase II was the residential development. The Defendants named in the original action were all adjacent property owners who had formed an association known as the "Concerned Citizens of Old Milford Road."[2] These original Defendants opposed Plaintiffs' development of the purchased property, claiming the development contributed to or caused problems, including soil erosion, sewage difficulties, and disruption of streams.

---

[1]. The four cases filed by Plaintiffs are: 91-886 (*Katz* I); 94-383 (*Katz* II); 01-16 (*Katz* III); and 03-2377 (*Katz* IV).

[2]. Named as defendants in the original Complaint were the following: Keith Peters and/or Nancy Peters, William Bogach, Sr., and/or Barbara Bogach, Kenneth Thiele and/or Joyce Thiele, and Marion Lewis, *et al.*, singly and /or jointly and/or also acting in concert as the Concerned Citizens of Old Milford Road, an unincorporated association.

In *Katz* II, CV No. 94-0383, the Plaintiffs sued Defendant Westfall Township and others, in part, for violating their civil rights pursuant 42 U.S.C. § 1983.  In an action brought pursuant to 42 U.S.C. § 1983, the Plaintiff must prove the following two essential elements in order to state a claim:  (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States.  *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v. Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993).[3]  At trial, the jury rendered a verdict in favor of Plaintiffs Katz and against the Defendant Township on their § 1983 claim.

After the Plaintiffs prevailed at trial in *Katz* II, a Judgment of more than $10 million was entered in their favor and against the Defendants, including the Defendant, Westfall Township, named in the above action.   The Township's portion of the Judgment was more than $3 million. (Doc. 48, Exhibit 1).  Subsequently, the Plaintiffs filed *Katz* III against the Township.  An Equitable Settlement Agreement ("ESA") was entered into between the parties in order to compromise the Judgment which the Plaintiffs had obtained against the Township in *Katz* II.  In the ESA, as described below, the Defendant Township agreed to take certain actions with respect to the Plaintiffs' properties in furtherance of their efforts to develop Phases I & II.  In their breach of contract action filed in the above case, Civil No. 03-2377, the Plaintiffs essentially claimed that the Defendant Township had  breached the terms of the ESA, which had hindered their ability to develop their properties.

The Plaintiffs filed a Motion for Summary Judgment, which the Court denied without prejudice on February 17, 2005.  (Docs. 29 & 64).

Subsequently, the Court set a trial date as to only the Township Defendant for July 18, 2005.  (Doc. 67).  A jury was selected and sworn in on the designated day of trial.  Thereafter, the Court dismissed  the jury, since the parties had expressed a desire to discuss settlement.  (Doc. 82). Later that day, the Court held a settlement conference, and the parties reported that they had settled the case.  The Court issued an Order on July 18, 2005 dismissing this case, but retained

---

3.    Section 1983 is not a source of substantive rights.  Rather, it is a means to redress violations of federal law by state actors.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

jurisdiction over each provision of the Settlement Agreement ("SA"). (Doc. 84). The Court signed the Settlement Order on August 4, 2005. (Doc. 86).

This case remained closed until February 26, 2007. The events which transpired leading to the re-opening of this case were that on February 16, 2007, Plaintiffs filed a Stipulated Judgment, pursuant to Section VI, ¶ I of the August 4, 2005 Order, against Defendant Township. (Doc. 89). On February 23, 2007, Defendant filed a Motion to Set Aside the Judgment pursuant to Fed. R. Civ. P. 60(b). **(Doc. 91)**.[4]  Defendant's Rule 60(b) Motion is the subject of the present Memorandum.

## II.  Defendant's Rule 60(b) Motion

Defendant's Motion has been briefed, and upon motion of Defendant, the Court conducted an expedited hearing on March 29, 2007. (Docs. 106 & 107, 93 & 94). Both parties presented exhibits at the hearing. (Docs. 111 & 112).[5]  At the hearing, counsel for Defendant requested to file supplemental post-hearing briefs, and the Court allowed the parties to do so. Plaintiffs and Defendant have filed their Supplemental Briefs. (Docs. 114 & 115).

Also pending is the Motion of Plaintiffs for Litigation Costs and Expenses, including Attorney Fees, incurred by Plaintiffs to enforce the ESA and the SAR pursuant to the Stipulated Judgment which they filed against Defendant on February 16, 2007. **(Doc. 92).** Plaintiffs seek the sum of $326, 461.21, as of January 31, 2007, which they claim to have incurred to enforce the stated Contractual Agreement (*i.e.*, ESA/SAR). On March 19, 2007, counsel for Plaintiffs filed an Affidavit in support of Plaintiffs' Motion for Costs and Expenses with exhibits. (Doc. 100). The Motion states that the Defendant is obligated to pay for the litigation costs and expenses incurred by Plaintiffs to enforce the Contractual Agreement. Plaintiffs' Motion for Litigation Costs and Expenses, and for Attorneys Fees, is supported by two Affidavits . (Docs. 97 and 98).

---

4.   We shall refer to the Township Defendant herein simply as Defendant.

5.   Plaintiffs' counsel also submitted a voluminous book of exhibits, Exs. 1-155. Not all 155 of Plaintiffs' exhibits were referenced at the hearing, and not all of Plaintiffs' exhibits were admitted into evidence.

Since we are granting Defendant's Motion to Set Aside the Stipulated Judgment, and shall set aside the Judgment Plaintiffs entered against Defendant, we will deny Plaintiffs' Motion for Litigation Costs and Expenses, and for Attorney Fees, without prejudice to re-file it if they re-file a Stipulated Judgment at a later date, and it is allowed to remain filed against Defendant.  Thus, without the Stipulated Judgment remaining in effect, there is no basis for Plaintiffs' Motion for Litigation Costs and Expenses, and for Attorney Fees. (Doc. 92).

Essentially, the August 4, 2005 Order approving  the Settlement Agreement of the parities provided that, if Defendant Township did not comply with the terms of ESA/SAR, it stipulated that Judgment would be entered against it by Plaintiffs.  The parties agreed to sign a Stipulated Judgment, and Plaintiffs were to hold it until such time as there was a breach of the ESA/SAR.  If a breach occurred by Defendant, Plaintiffs would file the Stipulated Judgment with Clerk of Court, and this Court would enter Judgment for Plaintiffs.  Plaintiffs claimed that various breaches of the ESA/SAR occurred by the Defendant and thus, on February 16, 2007, they filed the Stipulated Judgment against Defendant.  (Doc. 89).  Defendant then moved to set aside the Judgment entered against it.  (Doc. 91).

Defendant argues that it was not in breach of the Settlement Agreements (ESA/SAR), also hereinafter referred to as "CA" or Contractual Agreement, and that Plaintiffs should not have  filed the Stipulated Judgment against it.  Therefore, Defendant has moved to set aside the Judgment pursuant to Rule 60(b).

In their Rule 60(b) Motion, Defendant states:

> Defendant seeks relief from the Stipulated Judgment because: (a) Plaintiffs are mistaken that there has been any breach of the ESA/SAR and/or the Order; (b) Plaintiffs have acted in bad faith in entering the stipulated judgment without any breach of the ESA/SAR and/or Order; and (c) the Stipulated Judgment is void where there has been no breach of the ESA/SAR and/or the Order.

Thus, Defendant's Motion is based on Rule 60(b)(1), (3) and (4). (*Id*.).  Defendant states that Plaintiffs have mistakenly filed the Stipulated Judgment, since it did not breach any of the settlement documents, that Plaintiffs acted in bad faith, and that the Stipulated Judgment is void.

Defendant's Motion is timely, since it was filed well within one year after the Stipulated Judgment was entered. Defendant argues that, since it committed no breaches of the Settlement Agreements, its Rule 69)b() Motion should be granted to have the Stipulated Judgment stricken from the record.

Plaintiffs argue that Defendant had made numerous breaches of the CA as well as the Court's August 4, 2005 Order, such as with respect to the water and sewer services it was obliged to provide to their commercial and residential developments, and that they properly filed and recorded the Stipulated Judgment against Defendant. Plaintiffs contend that the Defendant's failure to properly perform its obligations under the ESA/SAR constituted a breach of the settlement agreements which entitled it, Under Section VI, ¶ I of the August 4, 2005 Order, to file the Stipulated Judgment. As mentioned, in conjunction with the filing of the Stipulated Judgment, Plaintiffs also moved the Court for litigation expenses and costs, and attorney fees, incurred by them to enforce the CA. (Doc. 92).[6]

Initially, we find that the Court has subject matter jurisdiction over the Defendant's current Motion and dispute, since the August 4, 2005 Order specifically provided that the "Court shall retain sole, exclusive, complete and ongoing jurisdiction over each and every term, obligation, purpose and duty contained in the ESA/SAR, this Order, and any judgment entered thereto." (Doc. 86, p. 14, ¶ VI. K.). Thus, since the Court's August 4, 2005 Order provided that the Court retained jurisdiction over compliance with the ESA/SAR and the Order itself, we have subject matter jurisdiction over the dispute as to whether Defendant has fully complied with the settlement agreements and settlement Order, and whether Plaintiffs have properly filed the Stipulated Judgment against Defendant. As the Court stated in *U.S.A. Skill Construction Co. v Ins. Co. of North*

---

[6]. We expedite our ruling on Defendant's Motion to Set Aside Judgment since it was indicated in Defendant's Motion for an expedited hearing and at the 3-39-07 hearing that, on or about March 6, 2007, Defendant has stopped the work of the Township Sewer Authority regarding the construction of sewage pumping station to serve Plaintiffs' property. Defendant indicated that it has 90 days to either resume work or terminate the contract. (Doc. 93). If the work stoppage exceeds 90 days, and Defendant's Rule 60(b) Motion is granted, then Defendant will have to new contract to finish the partially completed sewage pumping station project. Specifically, at the hearing, Defendant requested a decision from the Court by June 2007.

*America*, 1999 WL 305514, * 3 (E.D. Pa.), citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994), "[e]nforcement of the settlement agreement, [ ] whether through award of damages or decree of specific performance, is more than just a continuation or removal of the dismissed suit, and hence requires its own basis for jurisdiction." Clearly, the August 4, 2005 Order made the parties' ongoing compliance with the ESA/SAR a subject of the Order, and it incorporated the terms and conditions of the ESA/SAR. (*Id.*).  *See Williams v. PA Board of Probation & Parole*, 160 Fed. Appx. 212, 214-215 (3d Cir. 2005)(Non-Precedential).

We also find that Defendant's Motion is properly filed pursuant to Rule 60(b).  *See Perry v. Del. River Port Auth.*, 2006 WL 3690650, *2 (3d Cir.)(Non-Precedential).  In *Perry*, the Court stated that:

> Rule 60(b) provides for relief from judgment based on (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation or other misconduct of an adverse party; (4) a void judgment; (5) the satisfactions, release or discharge of a judgment or inequity in the prospective application of the judgment; or (6) any other reason justifying relief from operation of the judgment.  Such a motion must be made "within a reasonable time, and for reasons (1), (2), and (3), not more than one year after the judgment, order or proceeding was entered or taken."  Fed.R.Civ.P. 60(b).

*Id.*

Defendant's Rule 60(b) Motion was filed within one year after the Stipulated Judgment was entered, and thus relief is available under all six reasons of the Rule.  We find that Defendant's basis for relief under Rule 60(b) is that Plaintiffs have mistakenly asserted that it breached the Settlement Agreement (ESA/SAR), that Plaintiffs improperly filed the Stipulated Judgment against it, and thus, it is void.  Specifically, as stated above, we find that Defendant relies upon Rule 60(b)(1), (3) and 4).  (Doc. 91, p. 5, ¶ 6).

As the *Skill Const. Co.* Court stated:

> A party seeking relief under Rule 60(b)(3) bears the burden of proving fraud or misrepresentation by clear and convincing evidence.  *See* 11 Charles A. Wright, Arthur R. Miller & Mary K . Kane, *Federal Practice and Procedure* Civil 2d § 2860 (1995).  IN order to justify reopening a settlement agreement on the ground of fraud under Rule 60(b)(3), the fraud

> must be material, that is the moving party must have been prevented,
> by the misconduct of the other party, from "fully and fairly
> presenting its case." *Bandai America Inc. v. Bally Midway Mfg.
> Co.*, 775 F.2d 70, 73 (3d Cir. 1985).  There also must not be
> "neglect on the part of the moving party in pursuing the facts."
> *Id.*  The motion under Rule 60(b)(3) must be made within one year.
> Fed.R.Civ.P. 60(b).

The *Perry* Court also noted that the Magistrate Judge did not have authority to grant or deny the Rule 60(b) Motion in that case since the motion was only referred to a Magistrate Judge pursuant to 28 U.S.C. §636(b)(3).  *Id.*, n. 3.  In our case, we find that the parties have consented to our jurisdiction in this case under §6363(c), and thus, unlike *Perry*, we have not been referred the present Rule 60(b) Motion for a Report and Recommendation. (Docs. 34 & 38).  Therefore, we shall enter an Order with respect to Defendant's Rule 60(b) Motion.  *See* § 6363(c)(3)(consent of parties allows a Magistrate Judge to direct entry of a judgment).  As stated, since the August 4, 2005 Order incorporated the terms of the ESA/SAR and specifically retained the Court's jurisdiction as to compliance of the Order and settlement agreements, we have subject matter jurisdiction with respect to Defendant's Rule 60(b) Motion.  *See Williams, supra.; Skill Const. Co., supra.*

## II. Discussion

We repeat portions of the material facts in this case as detailed in our February 17, 2005 Memorandum.  (Doc. 64).

> The ESA is attached to the Plaintiffs' Summary Judgment Motion.  (Doc. 29,
> Exhibits A & B).  In July, 2001, during the finalization of the ESA, hand
> written changes to the ESA were made and read into the Court record.  The
> following statements were made on the record:
>
> > The Township will grant, immediately, the Katzes their heirs,
> > successors or assigns the right to use the sewage and water plants lines,
> > roads, property and agree to give easements or right-of-ways for such use,
> > work and development, etc. (Emphases Added).
>
> > The understanding being that in the event that the Plaintiffs or
> > their successors construct any water system or sewer system or
> > extensions of existing water or sewer systems, they will be allowed to
> > use those immediately.  (Emphases Added). (see Exhibit "A" July 2001
> > Transcript, p. 15 and 16, lines 23 - 7).
>
> (Doc. 29, ¶6. & Doc. 48, ¶ 6.).

Thereafter, the Township Board of Supervisors approved the terms of the ESA.  Under the terms of the ESA, the Township agreed to create an Enterprise District ("ED") Zone and a General Commercial ("GC") Zone and that the properties of Plaintiffs were to receive the benefits of the new zones.  To date, the Township has not created an ED Zone and a GC Zone. The Township admits that the zoning map has not been changed with respect to creating an ED Zone and GC Zone, but contends that the Plaintiffs' properties, Westfall Acreage (subject to to ED Zone obligation) and Westfall Commercial Property (subject to GC Zone obligation), have been treated by the Township as though they existed in an ED Zone and GC Zone.

The parties agree that under the ESA:

> the Township was to immediately reinstate the 1985 Township Zoning and Subdivision Ordinances with specifically stated exceptions, which provided for "Multi-Family Residential or Town House Developments" . . .  which according to the 1985 Zoning Ordinance must "be served with off-site (central) water supply and sewage disposal system . . ." (see Tp 1985 Zoning Ordinance p 18, ¶¶ 404.0  - 404.2, p. 1-3 ¶¶ 102, 104, 201.2 and p. 6 ¶ c - Exhibit "E").

(*Id.*, ¶'s 10).

The 1985 Township Subdivision Ordinance requires as follows:

> (I) Major subdivisions that include multi-family developments, commercial units or utilization of cluster techniques, <u>shall not receive preliminary plan approval unless the preliminary plans by the applicant can provide evidence of an adequate water supply;</u> and without preliminary plans Plaintiffs cannot develop their properties. (see Township 1985 Subdivision Ordinance p. 5, ¶ 2.100, p. 38 ¶ 6.225, and p. 8-9 ¶ 2.400 (q), p. 15-16, ¶ 3.500, p. 23-24 ¶ 3.1100, p. 35 ¶ 6.100 attached as Exhibit "F").

(*Id.*, ¶'s 11.).

If Multi-Family units are to be developed with 15 or more units, the development requires a public water system.  A U.S. Master (Michael J. Sandor) has been appointed by the Court to approve the Plaintiffs' development plans.

The parties dispute whether the ESA requires the Township to immediately serve a central/public water supply system and lines to the ED Zone. (*Id.*, ¶ 14.).  The Plaintiffs claim that without this service they cannot pursue their Phase I Plan to develop their properties.  The Defendant disagrees.

An Answer to the Complaint was filed by Defendant Township on January 29, 2005, and the Defendant admitted that it entered into the ESA. The Plaintiffs claim that they submitted a 70-acre Phase I Sketch Plan for 132 townhouses and 118 single family homes to the Master.  The Master questioned the source of the sewer and water supplies for Phase I,

specifically as to whether they would be coming from the Township system or the Plaintiffs' own system. The parties dispute whether the Plaintiffs can submit their preliminary plans to the Master for Phase I without first having a central/public water supply system and lines for their properties. As stated, the Defendant Township admittedly does not have a central water supply system.

Thus, there is no dispute that the Township does not have a central/public water supply system and that it never had such a system. Hence, the Township does not have central water supply lines to serve the Plaintiffs' properties. It is also undisputed that the ED Zone and GC Zone were not created by the Township. (*Id.*, ¶'s 20.). However, Defendant contends that the Plaintiffs' property is being treated as though the required ED Zone and GC Zone were, in fact, created. (*Id.*, ¶'s 20.). Thus, Defendant claims that the ED and GC Zones have been impliedly granted.

The relevant provision of the August 4, 2005 Order with respect to the Plaintiffs' filing of the Stipulated Judgment is as follows:

> If the Township does not fully comply with any and all terms, obligations and duties contained in the ESA/SAR and/or this Order, the Township stipulates that Judgment shall be entered against it granting Katz all remedies and damages requested in the "Wherefore" clause contained in the July 2, 2004, Summary Judgment Motion of David H. and Barbara D. Katz filed with this Court. The parties are directed to sign a Stipulation to Enter Judgment which will be held by Katz until such time as there is a breach of the ESA/SAR and/or this Order when the stipulation may be filed by Katz with the Clerk of Court and Judgment will be entered by this Court for Katz. However, should the ESA/SAR and this Order be completely satisfied, the Stipulation will be returned to the Township by Katz.

(Doc. 86, p. 13, Section VI, ¶ I.).

We now review the relevant testimony from the March 29, 2007 hearing. We found that Defendant, as the moving party, had the burden of proof with respect to its Rule 60(b) Motion. *See Skill Const. Co., supra,* * 2.

Defendant's first witness was Lisa Green, Defendant's Secretary/Treasurer, who is custodian of the Defendant's official documents. Ms. Green identified Defendant's Ex. 1 (Doc. 112) which is an Agreement dated November 21, 2005 between Defendant and the Municipal Authority of Westfall Township. She also identified Defendant's Ex. 2 (Doc. 112) which is an undated and signed Service Agreement, and is basically between the Municipal Authority of Matamoras ("Matamoras") and Defendant. The Service Agreement also listed Plaintiffs as parties

to it, but they did not sign it.  Both stated Agreements are entered into the Defendant's official Township records.

On cross, Plaintiffs showed Ms. Green their Ex. 156 (Doc. 111, Plaintiffs' Exhibit Book), minutes of Defendant's meetings from July 27, 2005 to August 24, 2005.  During these meetings, there is nothing in the minutes to reflect that Defendant approved of the Agreement with Matamoras for water service, and there is nothing in the minutes to show Defendant's approval of the water contract.  Plaintiffs' Ex. 156 was admitted into evidence.

Attorney Greg Chelak, Solicitor for Defendant since November 2003, testified that based on the ESA/SAR, Defendant contacted counsel for Matamoras to secure the required water capacity for Plaintiffs' commercial property, Phase I.  Defendant received a letter and application form Matamoras' counsel (Atty. Dougherty) to allow Defendant to get water service to Plaintiffs' commercial property.  Defendant's Ex. 3 was introduced, which is a copy of a letter dated August 9, 2005 to Defendant's counsel from Matamoras' counsel with the water service application. Chelak stated that he sent the attachments (including a property service request card) to the letter to Plaintiff's attorney at the time, Laura Feldman, Esquire.  Defendant's Ex. 4 is a copy of Chelak's letter to Attorney Feldman dated August 15, 2005 with attachments, regarding Matamoras' Agreement to provide water service to Plaintiffs' property.  Chelak stated that Defendant did not yet have a written agreement with Matamoras; rather, it had only a verbal agreement with Matamoras.  We agree with Chelak that there was an oral agreement between Chelak and Attorney Dougherty for Matamoras to provide water service to Defendant.  Chelak did not receive the property service request card executed by Plaintiffs back from Attorney Feldman.

In November 2005, since Chelak did not receive the executed property card back from Plaintiffs, Defendant officials executed the card for Plaintiffs and sent a check to Matamoras for reservation fees.  Defendant 's Ex. 5 is a copy of the Defendant 's letter to Matamoras' Secretary dated November 7, 2005, with the executed property service request card  and a check in the amount of $44,010.00.  Chelak stated that he drafted an Agreement, a contract, for Defendant to obtain water service from Matamoras to Plaintiffs' property, and he stated that it had provisions

regarding water capacity to Plaintiffs' commercial and residential developments as well as reservation fees owed by Defendant. Attorney Dougherty prepared a written contract. Defendant's Ex. 6 is a copy of the Agreement Chelak prepared for Defendant for a water contract with Matamoras to provide water service to Plaintiffs' commercial property (Phase I). Paragraph 2. of the Agreement expressly provided that the water contract was for the benefit of Plaintiffs, which Chelak stated was done pursuant to the ESA/SAR. Chelak sent the written Agreement to Attorney Dougherty, but Matamoras would not sign it because it wanted Plaintiffs and other Matamoras governmental entities to be parties to it, in addition to Defendant and Matamoras.

Chelak stated that Defendant's Ex. 2 is the Water Service Agreement ("WSA") Attorney Dougherty drafted with all of the parties he wanted, and that it was executed by Defendant's officials and Matamoras' officials. He stated that ¶ 14. of the WSA was for the benefit of Plaintiffs and that this paragraph was required by and met the requirements of the ESA/SAR.

Chelak stated that Plaintiffs' property fell under the Defendant's 1985 Subdivision Regulations ("ORDINANCE") (Defendant's Ex. 7), and that this Ordinance contained the water gallon requirement.  Page 15 of the Ordinance, ¶ 3.500 Water Supply, provided that each residential dwelling unit had to have a 400 gallon on site water requirement. He stated that this Ordinance was to govern and control the amount of water from on an onsite water supply for residential property, such as a well, and that it was not to regulate the water requirement from a public source.

On cross, Chelak was shown Plaintiffs' Ex. 3, which is the Court's August 4, 2005 Order (Doc. 86). "Section III. Water," of the Order provided that by August 15, 2005, Defendant shall enter contract with Matamoras for water service to Plaintiffs' commercial property. Chelak stated that Defendant had an oral agreement with Matamoras by August 15, 2005, but it had no written agreement by this date since the Defendant had not taken a vote on the Agreement with Matamoras. He stated that Matamoras had accepted Defendant's check of November 2005 regarding the WSA. He stated that his letter to Attorney Feldman dated August 15, 2005 (Defendant's Ex. 4) had enclosed the property card that Plaintiffs were supposed to have signed,

but Attorney Feldman never sent the signed card back to him.  While Chelak stated that he does not know if Attorney Feldman received his August 15, 2005 letter, there was absolutely no testimony or evidence that she did not receive it.  Chelak agreed that as of August 15, 2005, Plaintiffs had not been presented with any contract for water service to their property by Matamoras.

Chelak conceded that the Defendant did not make the payment for reservation of water capacity to Matamoras until November 2005 (Defendant's Ex. 5), but he stated that Attorney Feldman held up the WSA and thus, Plaintiffs were to blame for the delay.  He stated that Defendant moved forward in good faith.  As indicated, the WSA was not dated, and it had a Promissory Note (Ex. C to WSA) attached to it dated October 25, 2006.  Thus, Plaintiffs contend that the WSA was not effective until October 25, 2006.  However, Chelak stated that the WSA was still effective prior to the date of the Promissory Note, but he did not know the exact date when the WSA was signed, either in June or July 2006.

The Court finds no substantial breach by Defendant with respect to Section III. A. 2. of the August 4, 2005 Order (Doc. 86).  As discussed, the Defendant had an oral agreement in place with Matamoras by August 15, 2005 for water service to Plaintiffs' property, and part of the delay was caused by the failure of Plaintiffs to return the property card back to Chelak.  Not only did Plaintiffs fail to return the card, their counsel never even contacted Chelak and told him that Plaintiffs would not sign it.

We disagree with Plaintiffs (Doc. 114, p. 2) that the evidence failed to show that Defendant entered a contract with Matamoras by August 15, 2005.  Plaintiffs contend that their failure to sign Matamoras Authority's Application and Agreement for Water Service, and their failure to respond to Chelak's August 15, 2005 letter (Defendant's Ex. 4), is not relevant since there still would not have been a required contract between Defendant and Matamoras. (*Id.*, p. 3).  We disagree with Plaintiffs and find that their lack of response to Chelak's letter delayed the written contract between Defendant and Matamoras.  We also agree with Defendant that it had a valid oral agreement in place with Matamoras by the August 15, 2005 deadline.

We find that Defendant had moved forward in good faith to obtain an agreement with Matamoras for water service to Plaintiffs' property by August 15, 2005, and that Defendant did, in fact, comply when it eventually executed the WSA with Matamoras, without Plaintiffs' signature. Attorney Chelak stated that, pursuant to ¶ 14. of the WSA, Plaintiffs were beneficiaries of the Agreement. He did not think that Plaintiffs had to sign the WSA, according to the August 4, 2005 Order. We agree. Indeed, we find that if Plaintiffs felt that Defendant had breached Section III. A. 2. of the August 4, 2005 Order (Doc. 86), during 2005 or 2006, they would have filed the Stipulated Judgment against Defendant much earlier than February 16, 2007. (Doc. 89). In fact, Plaintiffs did not file the Stipulated Judgment until February 16, 2007, well after the August 15, 2005 deadline passed. If Plaintiffs felt that the deadline was not met, they should have moved to file the Stipulated Judgment at that time, and not wait until Defendant took further steps required by the Settlement Agreements and the August 4, 2005 Order, including the executing of contracts to complete water and sewer services to Plaintiff's commercial and residential properties.

As Defendant states (Doc. 115, pp. 1-2), the evidence reveals, through Attorney Chelak's testimony, that an oral agreement was made with Matamoras by August 15, 2005 to provide water service to Plaintiffs' commercial property. The evidence shows that, as of August 15, 2005, Matamoras was willing, ready and able to provide water service to Plaintiffs' stated property and that it did in fact provide such service. (Defendant's Exs. 3 & 4). There is simply no evidence that Matamoras was not going to provide the water service as it had agreed to do, and that it did not accept Defendant's offer to provide such service. As stated, there is no dispute that water service was provided by Matamoras to Plaintiffs' commercial property.

Next, Attorney Chelak was questioned regarding the Promissory Note attached as Ex. C to the WSA. Plaintiffs argue that the water agreement between Defendant and Matamoras could not have been effective prior to execution of the Note. (Doc. 114, p. 4). The Note, $220,050, was due and payable by Defendant to Matamoras on two conditions, the date construction of Plaintiffs' Rosetown residential property begins and if notice of demand of the money in the Note is requested. Defendant then had 15 days to pay the Note. Thus, Plaintiffs pointed out that the WSA

can be terminated at will by Matamoras, ¶ 13. Default, p. 4 of WSA (Defendant 's Ex. 2).  Plaintiff stated that if Defendant defaults on the Note, then Matamoras can cut off water service to Plaintiffs' property within 15 days.   Plaintiffs indicated that this provision was not in the August 4, 2005 Order. (Doc. 114, p. 5).   However, we find that such provision was not precluded by the Order. Further, there was no evidence that Defendant defaulted on the Note to cause the water service to Plaintiffs' property to be cut off or that Defendant was unable to pay the Note.

Plaintiffs than questioned Attorney Chelak about the Defendant's 1985 Ordnance (Defendant 's Ex. 7) and the 400 gallon of water per house per day requirement.  Under the August 4, 2005 Order (Doc. 86 and Plaintiffs' Ex. 3), Section  III. A. 2., Defendant was required to provide 90 EDU's (equivalent dwelling unit) of water capacity and lines  to Plaintiffs' commercial property by July 15, 2006 (90 days after April 15, 2006).  A letter of commitment from Matamoras was required to show this water capacity could be supplied to Defendant.

On re-direct, Chelak stated that Defendant's minutes of May 2, 2006 (Defendant's Ex. 8, p. 3, bottom) had a discussion of Defendant's Agreement with Matamoras to provide water lines to Plaintiffs' property (Phase I), and that the motion was granted to accept and sign the Agreement. Attorney Chelak reiterated that Attorney Feldman never sent the property card. enclosed with his August 15, 2005 letter, back to him. Plaintiffs argue that the Defendant's Minutes from its May 2, 2006 meeting (Defendant's Ex. 8) show that Defendant had no agreement with Matamoras for water service to Plaintiffs' properties at that time. (Doc. 114, p. 3).

The August 4, 2005 Order provided, as stated, that Defendant must enter into a water service agreement with Matamoras by August 15, 2005, and we find that Defendant substantially complied with this requirement of the Order.  Specifically, the August 4, 2005 Order provided in Section III., ¶ A. 2. a. as follows:

> On or before August 15, 2005, the Township shall enter into a contact with the Matamoras Authority, with Katz as third party beneficiary, for 90 EDU's per day of water to service the Westfall Commercial Property.

(Doc. 86 (Plaintiffs' Ex. 3), p. 7).

In fact, Matamoras would not sign the Agreement Chelak drafted since all parties that Matamoras wanted were not on it.   We find that Defendant did everything within its power to comply with the August 15, 2005 deadline, and that it did comply with this provision.   Chelak stated that 90 EDU of water was available as of July 14, 2006 from Matamoras to Plaintiffs' property. Defendant 's Ex. 9 was a copy of Attorney Dougherty's letter of July 14, 2006 to Attorney Chelak indicating that Matamoras had 90 EDU of water available to Plaintiffs' property as of July 15, 2006.  This letter indicated that both Defendant and Matamoras had executed the WSA (Defendant's Ex. 2).  We find that this uncontested evidence is sufficient to show that the WSA was executed by July 15, 2006, and was considered in ful force and effect by Defendant and by Matamoras. We find that the evidence shows that water service, with 90 EDU capacity,  was in fact available to Plaintiffs' property by the July 15, 2006 deadline.  The WSA provided that Plaintiff's commercial property was entitled to receive up to 18,000 gallons of water per day and that Plaintiffs' Rosetown property was entitled to receive up to 50,000 gallons of water per day.  (WSA, Defendant 's Ex. 2, p. 3, ¶ 7. A. & B.).[7]

We  find no failure of Defendant to comply with the August 4, 2005 Order (Doc. 86) with respect to Water Service provision contained therein.  We disagree with Plaintiffs that Defendant failed to contract for the required water capacity to their properties, and that Defendant only contracted to provide half the required water capacity.  (Doc. 114, pp. 4-5).  Thus, with respect to the Water Service provision of the August 4, 2005 Order, we find that the evidence show Defendant fully complied with all of their obligations and were not in default of this provision. Again, as stated, if Plaintiffs believed a breach had occurred with respect to the water service provision, they should have acted promptly in filing the Stipulated Judgment instead of allowing Defendant to continue work on providing their properties with sewer and water services.

---

[7] .   At the March 29, 2007 hearing, the Court admitted into evidence Defendant's Exhibits #1-#9 (Doc. 112).  Plaintiffs had no objections to the admission into evidence of Defendant's stated exhibits.

Defendant's third witness was Fred Courtright, a civil engineer with FX Brown, an engineering firm used by Defendant as a consultant.  He is a P.E., and provided engineering services to the Defendant with respect to sewer and water lines.  He was involved with the design and construction of the sewer and water systems in Defendant Township to Plaintiffs' commercial and residential properties.  Courtright stated, as indicated above, that the WSA provided for 18,000 gallons per day of sewer to Plaintiffs' commercial property, which was the equivalent of 90 EDU's (*i.e.* 1 EDU equals 200 gallons per day).  (Defendant's Ex. 2, p. 3).   He stated that this was in compliance with the August 4, 2005 Order which required Defendant to provide 90 EDU's of water to Plaintiffs' commercial property. (Doc. 86, p. 7).   He stated that he was not aware of any definition that 1 EDU was equivalent to 400 gallons per day.

Therefore, we agree with Defendant (Doc. 115, pp. 1-2), and find that Defendant had entered  a contract by August 15, 2005 with Matamoras for 90 EDU's of water to Plaintiffs' commercial property and that Plaintiffs were the third party beneficiaries of the contract.  (August 4, 2005 Order, Doc. 86,  Section III., ¶ A. 2.a.).  The WSA also stated that the water capacity reserved under the Agreement was for the benefit of Plaintiffs and their properties. (Defendant's Ex. 2, p. 5, ¶ 14.).

Plaintiffs offered no evidence that Matamoras did not consider that it had a contract with Defendant at this time, and Defendant has proven that an offer, an acceptance and consideration were all made by August 15, 2005 with respect to its contract with Matamoras.  Under the WSA, we find that Plaintiffs had the right to receive water for their properties and that Matamoras agreed to provide water service to Plaintiffs' properties.

Section II., ¶ A. 3. of the August 4, 2005 Order (**SEWER**) provided:

> The Township shall not be responsible for constructing any sewage facilities on the Katz Properties, except to accommodate the main sewer line for gravity feed at the Rosetown Trail entrance. Katz and the Township acknowledge that the Township shall always provide gravity connections for the Katz Properties to the sewer line.

(August 4, 2005 Order, Doc. 86, Section II., ¶ A. 3. (Plaintiffs' Ex. 3) ).

Defendant was required to provide gravity connection to Plaintiffs' properties to the sewer line, *i.e.* a connection that sewer is provided by gravity without a pump required.  Thus, under the Order, sewer had to flow from the Plaintiffs' properties to the sewer line by gravity and not by being pumped to the line.   Under Section II., ¶ A. 1. a. of the Order, Defendant Municipal Authority was required to construct a sewer system with the Plaintiffs as third party beneficiaries.  Courtright stated that a sewage treatment facility does not include a sewer pumping station, and under the Order, the Defendant was not required to build a sewer pumping station at Rosetown.  However, he stated that Defendant constructed a sewer pumping station at Rosetown because the Order required the sewer to flow by gravity from Plaintiffs' property to the sewer line.  He stated that Defendant commenced construction of the pumping station at Rosetown (Plaintiffs' residential property).  He also stated that he drafted a design for the construction of a sewer pumping station for Plaintiffs' commercial property, but that construction of this pumping station had not yet begun.

Courtright stated that the Rosetown pumping station is larger and more detailed, and that they know where the houses are going.  Therefore, Courtright stated that Defendant started construction of the pumping station at Rosetown.  However, he stated that Defendant does not yet have detailed plans for Plaintiffs' commercial property, and this is why no construction of a pumping station for the commercial property has begun.  He stated that Defendant has made inquires of Plaintiffs as to the details of their commercial property, but received no response from them.

According to Courtright, as Defendant points out (Doc. 115, pp. 7-8), sewer and water lines were due to Plaintiffs' commercial property by July 14, 2006, and he sated that the sewer lines (meaning sewer pipes in the ground)  were in May 11, 2006, and the water lines were installed as of July 6, 2006.  Thus, he stated that both lines were in prior to July 14, 2006.  He stated that the Settlement Agreements required water and sewer lines to Plaintiffs' Rosetown property by February 2, 2007, and that these lines for Rosetown were completed by January 24, 2007.  He stated that the Certificate of Completion was dated January 24, 2007. Thus, based on Courtright's testimony, we find, as Defendant argues (Doc. 115, pp. 4-5), that Defendant installed the water and sewer

lines to Plaintiffs' commercial and Rosetown properties by the due dates.  We agree with Defendant (*Id.*, p. 8) that under the Order, based on Courtright's testimony, that the term "sewer system" as used in the August 4, 2005 Order, "Sewage treatment facilities, equipment and lines" does not include pump stations.  We also agree with Defendant that Section II., ¶ A.1.b. of the Order did not include sewage pumping stations.  If the parties, who are sophisticated and were both represented by capable counsel, had  wanted sewage pumping stations included in the definition of the sewer system term, they should have so stated in the August 4, 2005 Order they drafted.  The Court will not add, on its own, a requirement to the Order when we find the plain language of the Order, based on its four corners, did not include such a requirement.

We also agree with Defendant (*Id.*, pp. 5-6), that Defendant has made provision for sufficient water and sewer capacity to Plaintiffs' properties.  We disagree with Plaintiffs that the water capacity was inadequate. (Doc. 114, pp. 4-5).  We agree with Courtright's interpretation under the August 4, 2005 Order and find it reasonable that the sewer pump stations, while no deadline for them was mentioned in the Order, should be constructed by the date that Plaintiffs' properties were to be developed.  We also agree with Courtright that Defendant complied with the Order regarding the sewer system construction at Rosetown, in terms of time line and capacity. Plaintiffs argued that Defendant could not complete the main sewer line for gravity feed without construction of a sewer pump station and that Defendant breached the Order since it did not construct a sewer pump station by the Order's deadline applicable to sewer lines.  Defendant argued that the sewer lines were completed by the Order's deadline and that the Order did not mention a pump station.  Defendant represented that a pump station will be constructed when Plaintiffs' property is developed.

Plaintiffs offered their Ex. 146, Attorney Waldron's (Westfall Township Sewer Authority Solicitor) letter to Attorney Klein (Plaintiffs' attorney) dated February 14, 2007, indicating that the Authority and Defendant had completed the design of Rosetown pump station, but not for Plaintiffs' commercial property, since they did not know the details of the Plaintiffs' commercial property.   Plaintiffs then pointed to their Ex. 136, letter from Defendant's new P.E., MJS

Engineering, to Attorney Waldron, stating that it can construct a sewer pump station for Plaintiffs' commercial property without knowing any details. Courtright stated that a pump house can be designed if you make assumptions about Plaintiffs' commercial property.[8]

Attorney Waldron, Westfall Township Sewer Authority Solicitor, testified for Defendant that he dealt with the expansion of the Authority's sewer plant. He stated that there were two phases of the expansion, one of which was to increase the capacity per daily gallons to 300,000 gallons in the fall of 2005. He said that the Authority was in the process of Phase II, expanding the sewer plant from 300,000 gallons to 820,000 gallons. He stated that the Sewer Authority received a grant from the EPA for approximately $8 million, and that it was going to use the grant money for Phase II of the sewer plant expansion. He said that the EPA grant document has a series of deadlines that must be met, namely, that if the sewer plant expansion is not completed by 2011, the grant money will be forfeited. He stated that by July 2008, the Authority plans to have the sewer expansion completed. He sated that Phase II of the sewer expansion project was done for Plaintiffs' properties. He stated that the Authority needs PRUC approval for Phase II, with respect to the effluent flow into the river. He indicated that 200 gallons per day EDU is a reasonable number for sewer flow for a home. The Court agrees with this conclusion that Defendant contracted for sufficient sewer capacity to Plaintiffs' properties, especially since we find no credible evidence to the contrary.

Attorney Waldron stated that the pump station for Rosetown was near completion, and that it was due to be finished by March 31, 2007, two days after the hearing. He stated that the construction on the pump house was stopped in early March 2007 because of the Stipulated Judgment Plaintiffs filed in this case and the uncertainty it created.[9]

---

8.   At the March 29, 2007 hearing, the Court admitted into evidence Plaintiffs' Ex. 146, with no objection from Defendant.

9.   We have acknowledged that the construction contracts were stopped by Defendant due to the filing of the Stipulated Judgment by Plaintiffs, and that is why we granted Defendant's Motion for an Expedited Hearing and request for an expedited decision on its Rule 60(b) Motion.

Attorney Waldron reiterated what Courtright stated, that no pump station was started yet for Plaintiffs' commercial property since it was uncertain to to their plans for this property. He stated that the Defendant's new engineering firm indicated that a pump station for Plaintiffs' commercial property could be done in 60-90 days. He concluded his direct testimony by stating that the Sewer Authority has its own money for construction of sewer lines to Plaintiffs' properties and money for a pump station for their residential property. He stated that Defendant has financing available for pump station construction, but it is on hold due to Plaintiffs' Stipulated Judgment it filed. He stated that he was not contacted by anyone about when sewer project will be completed for Plaintiffs' properties.

On cross, Waldron agreed that he assumed that a pump station would be required by any settlement agreement. He stated that the Agreement between Defendant and the Westfall Municipal Authority dated November 21, 2005, which he drafted, (Defendant's Ex. 1), at ¶ 5, the Authority was responsible for construction of sewer lines, including pump stations which may be necessary. He agreed that the pump station, sewer lines and manholes were due for Rosetown by February 4, 2007, but that they were not completed by this date. He stated that construction was in process until early March 2007 when the Authority issued the above referenced stop order due to Plaintiffs' filing of the Stipulated Judgment. He agreed with Plaintiffs that the second expansion was to available at Rosetown 18 months after Plaintiffs sent the sketch plan to the Federal Master, and Plaintiffs indicated that this plan was sent January 2007. He stated that the Authority was committed to the July 2008 date for the second sewer expansion date pursuant to the August 4, 2005 Order. He stated that the Authority applied for financing and an EPA grant was obtained for the second expansion.

Plaintiffs offered their Ex. 142 into evidence and the Court admitted it, HRG Engineering letter of February 9, 2007 to Federal Master Sandor regarding the sewer expansion project of the Municipal Authority. This letter references the increased capacity from 300,000 gallons per day to 820,000 gallons per day. An environmental impact study had to be completed for compliance with the EPA grant. The EPA grant had certain deadlines that had to be met. HRG did not give an

estimate as to the time for completion of the sewer expansion project, but Courtright estimated 9 to 12 months.  The FX Brown Engineering firm, while no longer the consultant for the Municipal Authority, is still involved with the sewer expansion project.

Attorney Waldron also indicated that the 200 EDU's for Plaintiffs' Rosetown property was sufficient sewer capacity per household.  He stated that the PRUC was advised of the 200 EDU capacity for Rosetown, and that it did not object to it.  He stated that if an individual home in Rosetown went over the 200 EDU per day, the Authority would not cut it off from service.  As stated, we find no evidence to controvert the evidence of Defendant that it was providing sufficient water and sewer capacities for Plaintiffs' properties.

On re-direct, Attorney Waldron indicated that the Rosetown pumping station construction was delayed and that a 2-month extension was required from March 31, 2007.  FX Brown firm issued a delay since an easement agreement was needed for Plaintiffs' property to finish the pump station.  In mid-January 2007, the Authority received an easement from Plaintiffs for the pump station.[10]

Plaintiffs called Attorney Feldman, their prior attorney of record  in this case,  to testify. She stated(as she averred in her Affidavit, Plaintiffs' Ex. 11),that Plaintiffs sketch plan was submitted before the August 4, 2005 Order, and that Defendant's position that water service was not due at Rosetown for 18 months after Plaintiffs submitted their sketch plan to the Federal Master was unfounded.  She stated that during the negotiation of the terms of the August 4, 2005 Order, it was agreed that Plaintiffs did not have to re-submit a sketch plan. It was Plaintiffs' understanding that water service was due to their Rosetown property 18 months from the August 4, 2005 Order.  She conceded that the August 4, 2005 Order was silent as to if Plaintiffs had to re-submit a sketch plan. She stated that the Order did not specify that Defendant had 18 months from the date of the Order to complete water service to the Rosetown property.  Plaintiff then moved for admission into

---

10.    At this time during the March 29, 2007 hearing, Defendant's case-in-chief ended, and Defendant moved for admission into evidence all of its exhibits (Doc. 112, Exs. 1-9), and the Court admitted them into evidence.

evidence Plaintiffs' Ex. 11, Feldman's Affidavit, and over Defendant's objection, the Court admitted it.

In their Brief (Doc. 114, pp. 6-7), Plaintiffs argue that Attorney Feldman testified that Defendant agreed in July 2005 that Plaintiffs did not have to re-submit their February 2004 sketch plan after the August 4, 2005 Order, to start the clock on the 18-month deadline for Defendant to provide water service to Rosetown. Plaintiffs point out that Attorney Feldman stated that Defendant agreed that 250 EDU's of water capacity and service must be supplied to Rosetown by February 4, 2007. Plaintiffs indicated that Federal Master Sandor testified that he advised Plaintiffs that they did not have to re-submit their sketch plan, and that the 18-month deadline started to run with the August 4, 2005 Order. Sandor also stated that water service to Rosetown was due by February 4, 2007.

With regard to water service to Rosetown, the August 4, 2005 Order stated:

> The Township shall provide the remaining water capacity and lines to the Katz Properties within 18 months after Katz submits any sketch plan to the Federal Master and Katz shall notify the Township of such submission. The number of EDU's provided shall be equal to the number of EDU's required to service the units sh own on any sketch plan submitted by Katz. Katz may submit more than one sketch plan for the Katz Properties.

(Doc. 86 , p. 8., Section III., ¶ B. 1. a.).

We agree with Defendant (Doc. 115, p. 5) that, in spite of our acceptance of Attorney Feldman's and Federal Master Sandor's testimonies that the water service was due to Plaintiffs' Rosetown property 18 months from the date of the August 4, 2005 Order, *i.e.* February 4, 2007, that Defendant met this deadline. Courtright testified, as discussed above, that the water line (as well as sewer line) to Rosetown was completed by January 24, 2007, and that a Certification of Completion is dated January 24, 2007. We have found Courtright's testimony to be credible and not to be contradicted by Plaintiffs' evidence, including Attorney Feldman's testimony and Affidavit. Thus, we agree with Defendant that it installed water lines to Plaintiffs' commercial and Rosetown properties by the required dates.

Edward Werkheiser testified for Plaintiffs.  He works for HRG Engineering, Defendant's new engineering consultant firm as of January 2007, as an Environmental Specialist.  He is not an engineer.  He is involved with Westfall's Sewer Authority work, and he performed the National Environmental Policy Act (NEPA) work for the Authority which was required by the EPA since it had received a grant from the EPA for its sewer expansion project.  He was shown his February 9, 2007 letter to Federal Master Sandor, Plaintiffs' Ex. 142, regarding Westfall's Municipal Authority sewer plant upgrades and expansion project from 300,000 gallons per day to 820,000 gallons per day. He indicated that to meet the EPA's requirements, he had to show the effects of  the increase sewage discharge  into the Delaware  River which would be caused by the expansion project. Significantly, he stated that the environmental work on the sewer expansion project will be done by 2011, and it is realistic that the expansion project itself will be done by 2011.  He stated that the NPDS Permit required for the expansion project was completed, and that this is a major hurdle that has been met.  He is currently waiting for the Delaware River Basin Commission's (DRBC) approval of the project plan which was submitted to it.

On cross, Werkheiser stated that Defendant did not require compliance with the NEPA; rather, the EPA did.  Nor did the Defendant require approval of the DRBC.  He stated that the current hold-up on the sewer expansion project is the DRBC's approval and the approval from the National Park Service.  He stated that Defendant is not holding up the project and that the approvals required by the NEPA and DRBC are the reasons for the hold-up.  He does not know when and if the DRBC will give its approval, but indicated that it is beyond the control of Defendant.  He stated that under the EPA grant deadlines, December 2008 was the date the approvals were due.

We find that Defendant has no control over the required approvals needed for the sewer expansion project, and that any delay caused by these approvals does not constitute a breach by Defendant of the August 4, 2005 Order and the ESA/SAR.

Federal Master Sandor was called by Plaintiffs, and he stated that in his opinion, a pump station was due by February 4, 2007.  He testified, as indicated above, that Plaintiffs' sketch plan

was submitted prior to August 4, 2005, and that Plaintiffs did not have to re-submit it.  He stated that, in his view, he felt that the clock started, with respect to the required water service to Rosetown, the date of the August 4, 2005 Order.  Thus, he concluded that water service was due at Rosetown by February 4, 2007.

As discussed above, we have found credible the testimony of Courtright that the water lines to Rosetown were completed January 24, 2007, and that the February 4, 2007 deadline was met.

Plaintiff David Katz testified that he refused to sign the WSA, Defendant's Ex. 2, because of the provision, *i.e.* ¶ 15. of WSA, that he had to indemnify Defendant for any default.  He stated that the Settlement Agreements and August 4, 2005 Order did not require Plaintiffs to be party to the WSA, and only required them to be third party beneficiaries of a water agreement.  He also had a problem with ¶ 13. of the WSA default provision that water would get shut off at both his residential and commercial properties if there was a breach of it by Defendant.   He stated that if there was a default of the Promissory Note attached to the WSA by Defendant, water to his properties could be shut off in fifteen (15) days, and that he would not be able to sell lots in  his Rosetown property if water could be cut off as allowed in the Note.  As Plaintiffs state in their Brief, Mr. Katz testified that this default provision makes his property unmarketable. (Doc. 114, p. 5).

We find no evidence that Plaintiffs tried to sell any of their Rosetown lots and that any sale fell through based on the default language of either the Note or WSA.  Plaintiffs offered no evidence that they had any agreement of sale  for any Rosetown lots that was not consummated due to the stated provisions.  Plaintiffs offered no evidence, in addition to Mr. Katz's testimony, that their Rosetown lots would not be marketable due to the stated provisions.  There was no evidence that Defendant failed to comply with any of its obligations of the WSA or the Note, or that Defendant could not comply with its obligations.   We find Plaintiff David Katz's testimony to be completely speculative as to his opinion that he cannot sell his Rosetown lots due to the default provision in the Note.  There was no evidence offered that service to Plaintiffs' properties was ever terminated due to any conduct by Defendant.

**24**

In fact, on cross, Plaintiff David Katz admitted that he did not have any contract with any real estate broker to sell Rosetown properties.  He stated that he is a licensed real estate broker and is in negotiation with land developers, and that he was told by David Rosenberg, a developer, that he was concerned with the sewer and water issues at Rosetown.  Mr. Rosenberg was not called by Plaintiffs to testify.  Nor did Plaintiffs produce any evidence to support Mr. Katz's testimony that land developers were concerned with the sewer and water issues.  Mr. Katz also agreed, and Plaintiffs stipulated, that water lines and sewer lines go to his commercial property.  Mr. Katz further agreed, and Plaintiffs stipulated, that water lines and sewer lines go to his Rosetown property.  We find Mr. Katz's testimony regarding his belief that developers would be and were concerned  with the sewer and water issues at Rosetown to be unsupported, and give it little weight.

Mr. Katz, on cross, admitted that he was not aware of any default by Defendant with respect to the Note attached to the WSA, and that he was not aware that Matamoras has declared any default.  He has no knowledge as to if Defendant can pay the Note, but has offered no evidence that Defendant cannot pay the Note.  We agree with Defendant that if it can pay the Note, Plaintiffs will not be harmed.  We find that there is no evidence that Defendant has defaulted on the Note or that it will default on the Note.  Nor is there any evidence that Defendant is unable to pay the Note.  As stated, we find Mr. Katz's testimony regarding his concern over the Note's default provision to be entirely speculative and give it little weight.

Plaintiff David Katz testified that he decided to file the Stipulated Judgment because he felt Defendant had not complied with the Settlement  Agreements and August 4, 2005 Order. Specifically, he stated that no pump station was completed with respect to his commercial property by July 15, 2005, and that no sewer line was completed to his commercial property by July 15, 2006 as required by Section II., ¶ A.1.b. of the August 4, 2005 Order.  (Doc. 86, Plaintiffs' Ex. 3). He stated that no sewer system extension and line to his Rosetown property, and no pump station, were completed by February 4, 2007 as required by Section II., ¶ A.1.b. of the August 4, 2005 Order.  (Doc. 86, Plaintiffs' Ex. 3).

Plaintiff David Katz testified that the November 21, 2005 Agreement and the WSA were not in compliance with the Settlement Agreements and August 4, 2005 Order. (Defendant's Exs. 1 & 2). He stated that the deadline for a water contract was not met, and that the WSA was not in compliance with Settlement Agreements and August 4, 2005 Order. He stated that he re-submitted the sketch plan to Defendant on January 1, 2007, and that he was not even required to re-submit it since the Federal Master was already working with the one he submitted prior to August 4, 2005. As stated, the Federal Master concurred with this testimony. Plaintiff stated that no sewer lines were completed by July 15, 2006, since there was no pump station. He stated that the sewer and water capacities provided to his Rosetown property were not sufficient.

As discussed above, we have found that Defendant timely completed the sewer and water services to both of Plaintiffs' commercial and Rosetown properties, and that the sewer and water capacities were sufficient under the August 4, 2005 Order. We do not find that the testimony of David Katz as to the breaches of the August 4, 2005 Order he alleges to be credible, and we do not find it to contradict the Defendant's evidence with respect to our stated findings. We do not afford Plaintiff David Katz's testimony with enough weight to agree with him and to find that Defendant breached any provision of the August 4, 2005 Order.

There was no further testimony at the March 29, 2007 hearing. The Court granted the motion of both parties to admit any exhibits they relied upon at the hearing but forgot to move to admit. The Court also, as stated, permitted both parties to file supplemental post-hearing briefs, and the parties did so. (Docs. 114 & 115).

We find, based on the hearing evidence and the filings of the parties, that Defendant has timely and fully complied with all terms and provisions of the ESA/SAR and August 4, 2005 Order, and that it is continuing to perform as required in these Settlement Agreements. We find no breaches of these Settlement Agreements by Defendant, and find that the filing of the Stipulated Judgment by Plaintiffs on February 16, 2007 (Doc. 89) was not justified by Section VI., ¶ I. of the August 4, 2005 Order (Doc. 86). We find that Defendant has met its burden of proof with respect to its Rule 60(b) Motion.

Based on the foregoing, we shall grant Defendant's Rule 60(b) Motion to Set Aside the Stipulated Judgment **(Doc. 91)** Plaintiffs filed against it on February 16, 2007 (Doc. 89), and shall Order the Clerk of Court to strike this Judgment from the docket.  We shall direct Defendant, immediately after the Stipulated Judgment filed by Plaintiffs is stricken and removed from the docket, to lift any and all Stop Work Order(s) with respect to any contracts it entered to complete its obligations  under the Settlement Agreements and the August 4, 2005 Order.  (*See* Doc. 93). We shall direct Defendant to complete, in full, all of its remaining obligations under the Settlement Agreements and the August 4, 2005 Order.

Further, as stated above, since we find that Plaintiffs were not justified in filing the Stipulated Judgment under the August 4, 2005 Order, we shall deny their Motion for Litigation Costs and Expenses, and for Attorney Fees **(Doc. 92)** related to their filing of said Judgment and to their Enforcement of the Settlement Agreements and August 4, 2005 Order.

An appropriate Order will issue.


**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: May 4, 2007**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID H. KATZ AND BARBARA D. KATZ, | : | CIVIL ACTION NO. **3:CV-03-2377** |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Magistrate Judge Blewitt |
| | : | |
| TOWNSHIP OF WESTFALL | : | |
| | : | |
| | : | |
| Defendant | : | |

## ORDER

**AND NOW,** this 4th day of **May, 2007**, **IT IS HEREBY ORDERED THAT:**

1.  Defendant's Rule 60(b) Motion to Set Aside the Stipulated Judgment **(Doc. 91)** Plaintiffs filed against it on February 16, 2007 (Doc. 89), is **GRANTED**.

2.  The Clerk of Court is directed to strike and to remove this Judgment from the docket.

3.  Defendant is directed, immediately after the Stipulated Judgment filed by Plaintiffs is stricken from the docket, to lift any and all Stop Work Order(s) with respect to any contracts it entered to complete its obligations under the Settlement Agreements and the August 4, 2005 Order. (*See* Doc. 93).

4.  Defendant is directed to complete, in full, all of its remaining obligations under the Settlement Agreements and August 4, 2005 Order.

5.  Plaintiffs' Motion for Litigation Costs and Expenses, and for Attorney Fees **(Doc. 92)** related to their filing of the Stipulated Judgment, and related to their Enforcement of the Settlement Agreements and the August 4, 2005 Order is **DENIED.**

6.  Each Party is to bear their own costs.

                                   s/ Thomas M. Blewitt
                                   **THOMAS M. BLEWITT**
                                   **United States Magistrate Judge**

**Dated: May 4, 2007**